O

NO JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VICTORIA URENIA, an individual; SOLEDAD CORONA, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. CV 13-01934 DDP (AJWx) |
| Plaintiffs, | | **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | | [Dkt. Nos. 192, 196, 204] |
| PUBLIC STORAGE, a real estate investment trust; CITY OF LOS ANGELES, a governmental entity; BANK OF AMERICA, N.A.; MICHAEL ANZ, | | |
| Defendants. | | |

Presently before the Court are motions for summary judgment filed by Plaintiffs (Dkt. No. 196), Defendant City of Los Angeles (Dkt. No. 204), and Defendant Bank of America ("BANA") (Dkt. No. 192).  Having heard oral arguments and considered the parties' submissions, the Court adopts the following order addressing all three motions.

**I.   BACKGROUND**

Plaintiff Javier Hernandez owned and, with Plaintiff Brenda Hernandez, resided at a certain property on Leadwell St. in Van

Nuys, CA.  (Third Amended Complaint ("TAC"), ¶ 2.)  Plaintiffs had purchased the property via a mortgage loan, secured by a deed of trust, that was originally held by Countrywide and later taken over by BANA.  (Id. at ¶¶ 35-37; Decl. Javier Hernandez, Ex. B.)  Countrywide recorded a notice of default in 2008.  (Id. at ¶ 36.)  BANA foreclosed on the loan; in 2011 the property was sold at auction to The Bank of New York Mellon ("Mellon"), and a trustee's deed upon sale was recorded.  (BANA's RJN, Ex. A.)

Plaintiffs refused to vacate the property.  (TAC, ¶ 40.)  Mellon filed an unlawful detainer action against Plaintiffs, and in June 2012 the Superior Court issued a judgment of possession in Mellon's favor.  (BANA's RJN, Exs. B-C.)  The court also issued a writ of possession authorizing eviction and directing the sheriff to enforce compliance, on the condition that no lockout should take place prior to July 15, 2012.  (Id., Ex. D.)  After the auction sale and the judgment, BANA and Plaintiff Javier Hernandez continued to negotiate a possible loan modification; however, in October 2012 the bank ultimately rejected the application for modification, citing an inability to confirm the incomes of certain of Plaintiff's family members.  (Decl. Javier Hernandez, Exs. C-E.)  In the letter rejecting the application, BANA informed Plaintiff that "your account is no longer being reviewed for any workout assistance" and "we are required . . . to proceed with the eviction process."  (Decl. Javier Hernandez, Ex. E.)  One news source reported that a BANA spokesperson had stated in an email that "it is the bank's policy to avoid foreclosure sales or displacement of homeowners or tenants around the Christmas holiday," although the bank declined to discuss specific dates.  (Supp. Decl. Javier

Hernandez, Ex. 1.)  The Los Angeles Sheriff's Department ("LASD") ultimately carried out the eviction on December 27, 2012.  (Decl. Javier Hernandez, ¶ 11.)

Plaintiffs now sue for alleged First and Fourth Amendment violations, as well as violations of anti-trust law and California's Unfair Competition Law (UCL).  (Compl., generally.)

## II.  LEGAL STANDARD

Summary judgment is appropriate where the materials in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from the evidence must be drawn in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under

the governing law."  Anderson, 477 U.S. at 248.  There is no
genuine issue of fact "[w]here the record taken as a whole could
not lead a rational trier of fact to find for the nonmoving party."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).

**III.  DISCUSSION**

**A.    First and Fourth Amendment Violations**

**1.    BANA as a State Actor**

     Plaintiff sues BANA under 42 U.S.C. § 1983, which provides for
relief against persons who violate a plaintiff's federal
constitutional rights under color of state law.  Ordinarily, as a
private business organization, a bank does not act "under color of
state law."  However, where there is "significant state
involvement" in a private party's action, it may be considered
"under color of state law" for § 1983 purposes.  Howerton v.
Gabica, 708 F.2d 380, 382 (9th Cir. 1983) (internal quotation marks
omitted).  Thus, for example, state action may be found where a
state "devolves upon a [private] political organization the
uncontested choice of public officials," Terry v. Adams, 345 U.S.
461, 484 (1953), or where the private party has a "symbiotic"
lessor-lessee relationship with a state agency, Moose Lodge No. 107
v. Irvis, 407 U.S. 163, 175 (1972), or where there is a conspiracy
between the private actor and a law enforcement officer to practice
private discrimination with the threat of arrest behind it.
Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970).

     In Howerton, this last principle was in play: a landlord
conspired with a police officer to evict the plaintiffs, allegedly
without the required due process of law.  There, the court noted

4

1   that "[p]olice were on the scene at each step of the eviction,"

2   "the police officer . . . privately approached the Howertons and

3   recommended that they leave the trailerhouse," and "he inquired

4   whether the tenants had found a new rental."  708 F.2d at 384.

5   Thus, his actions "created an appearance that the police sanctioned

6   the eviction," although the eviction was in fact a private action.

7        Here, the eviction was not a private matter.  It was carried

8   out by LASD, pursuant to a court order issued in favor of Mellon.

9   But the eviction was requested, apparently, by a lawyer affiliated

10  with both Mellon and BANA.  (Decl. Tuan Uong, Ex. K.)  BANA also

11  took part directly in the eviction by having its contractors

12  retrieve Plaintiffs' belongings and move them to a storage unit.

13  Because the removal of Plaintiffs' possessions happened under the

14  apparent authority of LASD and/or LAPD, it can qualify as state

15  action on BANA's part.

16       Plaintiffs' other primary allegation of a constitutional

17  violation, that BANA conspired with the LAPD to harass and silence

18  Plaintiffs because they protested BANA directly and/or because they

19  were involved in the "Occupy" movement against inequality, could

20  also certainly qualify as state action, for the same reason.  And

21  allegation that a private entity uses law enforcement as a stalking

22  horse to pursue private ends is an allegation that the private

23  entity takes "state action" for § 1983 purposes.

24       The Court therefore turns to the substantive evidence

25  supporting these allegations.

26  ///

27  ///

28  ///

**2.   First Amendment Claim**

Plaintiffs allege that BANA and LAPD conspired to chill the free speech, association, and petition rights of protesters, including themselves, by:

> (1) having the LAPD and Bank of America monitor social media, cell phones, and fusion center data, and then arrive at each home or protest location and take photos of the members at the OFF events which plaintiffs are informed and believe and allege thereon were then passed onto Bank of America and/or their agents; (2) LAPD would also demand identification of all individuals present at the lock outs or protests0 [sic]; (3) LAPD would pass this information onto Bank of America; (4) Bank of America would then take that information and plan immediate lockouts in order to snuff out the protests. [Occupy] members who showed up to support other members . . . were suddenly finding themselves a victim of identity theft, a court process, or eviction.

(TAC, ¶¶ 78, 84-85.)

In Plaintiffs' own motion and reply, however, the Court has difficulty discerning *any* coherent First Amendment argument, let alone undisputed evidence showing that BANA and LAPD conspired to take the actions described above.  Plaintiffs assert that "Bank of America had the Los Angeles Police Department harass the Plaintiffs in retaliation for protesting illegal foreclosures."  (Pls.' Mot. Summ. J. at 1.)  However, the motion is almost entirely free of citations to a factual record that would support this contention. The same is true of Plaintiffs' oppositions to BANA and LAPD's motions.  It is not the Court's task "to scour the record in search

1   of a genuine issue of triable fact."  <u>Keenan v. Allan</u>, 91 F.3d

2   1275, 1279 (9th Cir. 1996).

3       Nonetheless, in the interest of justice, the Court examines

4   the record evidence in the light most favorable to Plaintiffs to

5   determine whether their claims could survive Defendants' motions

6   for summary judgment.  That examination shows that there is simply

7   no evidence showing that BANA coordinated a campaign of harassment

8   and retaliation against Plaintiffs.  Plaintiffs provide evidence to

9   show, at best, that Javier Hernandez is a member of Occupy and has

10  protested "in front of Bank of America on at least one occasion"

11  (Decl. Javier Hernandez, ¶¶ 5-6, 36); that he and Brenda Hernandez

12  staged protests against the foreclosure at his home (<u>id.</u> at ¶¶ 30-

13  35); that LAPD Officer Gavin[1] approached the house on October 4,

14  2012 and made some belligerent statements, including telling the

15  other protesters that Plaintiffs were "behind 48 months" on their

16  payments and saying "I wish I could live like that" (<u>id.</u> at ¶¶ 38-

17  49; <u>id.</u>, Ex. I); and that the following interactions with law

18  enforcement occurred during the six-month protest period: LAPD and

19  Child Protective Services visited the house, allegedly at

20  midnight,[2] police investigated a sanitation complaint regarding

21  couches in the roadway, "supporters" of the protest were stopped by

22  police three times, and items including a "wall," some couches, and

23

24

_____

25      [1]He is referred to as "Officer Gavin" in Javier Hernandez's
26  declaration and "Lieutenant Gavin" in the moving papers.

27      [2]Plaintiffs provide video evidence of the visit, but the video
    does not actually show the presence of any identifiable LAPD
28  officers.  (Decl. Javir Hernandez, Ex. J, "9-17-12 DCFS LAPD try to
    take child.")

1   a "portrait," and police drove by the house numerous times.  (Id.
2   at ¶ 50.)

3       It is entirely possible that some of these actions were
4   harassing or intimidating – Officer Gavin, in particular, is
5   alleged to have taunted protesters and belittled their right to
6   free speech.  (Id. at ¶¶ 38-49; id., Ex. I.)  What is lacking,
7   however, is any evidence tying this behavior to BANA.  Plaintiffs
8   argue that a letter from BANA's attorney to LASD shows that there
9   was "coordination," because in that letter the attorney suggests
10  that her firm will keep the timing of the eviction "highly
11  confidential," so as to avoid "unwanted attention."  (Decl. Lenore
12  Albert, Ex. A at 30.)  But the fact that the bank's attorney
13  thought LASD might want to avoid unwanted attention during the
14  (presumably from protesters) simply does not lead to an inference
15  that BANA engaged in a months-long campaign of harassment
16  coordinated with LAPD, a different agency, long before the letter
17  was written.

18      Nor does the fact that Javier Hernandez protested "in front of
19  Bank of America" one time lead to the conclusion that BANA took
20  notice of the protest, identified Mr. Hernandez, connected him to
21  the property, and/or had the kind of control or influence over (or
22  even relationship with) LAPD as an entity that would enable the
23  coordinated campaign of harassment and intimidation that Plaintiffs
24  allege.

25      Plaintiffs also point to the fact that Officer Gavin allegedly
26  knew that Plaintiffs had not made mortgage payments for 48 months
27  as evidence that BANA *must* have supplied him with that information
28  and therefore *must* have been the puppetmaster behind his actions

and the actions of other LAPD officers.  (Pls.' Opp'n to LAPD's
Mot. at 6.)  But Defendants point out that Plaintiffs themselves
had publicized the fact that they had stopped paying their
mortgage, and Gavin stated on video that he had previously done
undercover work and surveilled the group.  (Suppl. Decl. Tuan Uong,
Exs. S, T; Decl. Javier Hernandez, Ex. I.)  Defendants also point
out that call logs show no communications between BANA and LAPD as
to the property.[3]  (Decl. Tuan Uong, Ex. R.)  There is therefore no
reason beyond the speculative to conclude that Officer Gavin got
his information from BANA.

As to BANA, Plaintiffs' evidence creates no more than a
"metaphysical doubt" as to the possibility of a conspiracy.
Matsushita, 475 U.S. 574, 586 (1986).  A rational trier of fact
could not conclude, on this evidence, that BANA acted in concert
with LAPD to violate Plaintiffs' First Amendment rights.

As to LAPD, nothing in Plaintiffs' evidence suggests a policy
or custom of retaliation, harassment, or intimidation against anti-
foreclosure protesters, as would be required to hold the City
liable for the acts of individual LAPD officers.[4]  Monell v. Dep't
of Soc. Servs. of City of New York, 436 U.S. 658, 690-91 (1978)
(municipality may be held liable for official policy or unofficial
custom, but not for individual torts of government agents).[5]  Thus,

---

[3]Plaintiffs point out that the call logs do not provide
complete information about the callers and are in a few cases
redacted.  However, Plaintiffs have provided no positive evidence
that BANA and LAPD were in contact.

[4]The individual officers are not named as defendants.

[5]Plaintiffs address Monell only by saying that it "is not
relevant. Monell deals with immunity. The LAPD was not immune
(continued...)

9

1  a rational trier of fact could not conclude that the City acted to

2  violate Plaintiffs' First Amendment rights.

3  **3.    Fourth Amendment Claim**

4       Plaintiffs also allege that Defendants acted to deny them

5  their Fourth Amendment right to be free of unreasonable search and

6  seizure during the eviction.  Although the exact gravamen of the

7  claim is not entirely clear, the TAC appears to allege four kinds

8  of Fourth Amendment violation: entry without a warrant or exigent

9  circumstances; seizure of the home; seizure of possessions; and

10 excessive force.  (TAC, ¶¶ 97-122.)

11      LASD, assisted by LAPD officers, evicted Plaintiffs from the

12 house pursuant to a statutory scheme specifically designed to deal

13 with situations where a former owner refuses to vacate a house

14 after foreclosure.  See Cal. Civ. Proc. Code § 1166a (if court in

15 unlawful detainer action finds for plaintiff, "order shall be

16 entered for the immediate possession of the premises"); § 712.010

17 ("After entry of a judgment for possession or sale of property, a

18 writ of possession or sale shall be issued by the clerk of the

19 court . . . "); § 712.020 (writ of possession requires levying

20 officer to enforce the judgment).  Plaintiffs do not challenge this

21 scheme on its face.

22     A Fourth Amendment claim as to entry into the home or seizure

23 of the home will necessarily fail if Plaintiffs do not have a

24

25          [5](...continued)
26 here."  (Pls.' Opp'n to LAPD's Mot. at 9.)  This argument is hard
   to parse.  Monell sets out the standard for determining when a
27 municipality can be sued under § 1983 – that is, the policy-or-
   custom standard.  LAPD is an agency of the City of Los Angeles, and
28 the City, a municipality, is the defendant here.  Monell is
   therefore not only relevant but dispositive.

1  possessory right to the home.  Persons in a private residential

2  property without a legal right of possession, such as squatters, do

3  not have an objectively reasonable expectation of privacy.

4  Zimmerman v. Bishop Estate, 25 F.3d 784, 787 (9th Cir. 1994).

5  Therefore, they cannot object to entry and search on Fourth

6  Amendment grounds.  Similarly, a person without a possessory

7  interest in a property necessarily cannot object to its seizure.

8  "A seizure of property ... occurs when there is some meaningful

9  interference with an individual's possessory interests in that

10 property."  Soldal v. Cook County, 506 U.S. 56, 61 (1992) (internal

11 quotation marks omitted).

12      Plaintiffs appear to argue that they did have a right of

13 possession, and that the entry and seizure were unlawful, because

14 the writ of possession authorizing the eviction was invalid

15 (because it lacked the debtor's address), and LASD officials knew

16 that it was invalid.  (Pls.' Opp'n to LAPD's Mot. at 9; Decl.

17 Lenore Albert, Ex. A at 21-23 (emails showing that some LASD

18 personnel were concerned about the writ and felt it should have

19 been rejected).)  But, first, the Court cannot consider the emails,

20 which lack foundation showing that they even refer to the Leadwell

21 St. property at all,[6] are hearsay,[7] and are not the best evidence

22

23 _____

24     [6]The property is not actually named in the email exchange,
   although the following exchange occurs: "Which case is this? Fort
25 Lucero?" "Yes, the ELA eviction you wanted to do Thursday."  (Pls.'
   Opp'n to LAPD's Mot. at 9; Decl. Lenore Albert, Ex. A at 22.)  The
26 house in this case, however, was nicknamed "Fort Hernandez," not
   "Fort Lucero."  (Decl. Javier Hernandez, ¶ 32.)

27     [7]Fed. R. Evid. 801 (hearsay is an out-of-court statement
   offered in evidence to prove the truth of the matter asserted in
28 the statement).

1  of the contents of the writ.[8]  Plaintiffs point to no copy of the

2  writ showing that the writ did not have their address on it.  The

3  copy of the writ submitted as an exhibit by Defendants, on the

4  other hand, plainly does have Plaintiffs' address on it.  (BANA's

5  RJN, Ex. D)  Nor do Plaintiffs allege that BANA's exhibit is

6  fraudulent or inauthentic.[9]

7      Second, what stripped Plaintiffs of their possessory interest

8  in the house was not the writ, which merely authorized the

9  eviction, but the foreclosure sale.[10]  There is no evidence

10 suggesting the foreclosure was improper, and the state court issued

11 an order in the unlawful detainer action explicitly giving Mellon,

12 not Plaintiffs, the right of possession.  There is no allegation or

13 evidence that the court order was improper or invalid.  Plaintiffs

14 therefore did not have a possessory interest in the house as of

15 December 27, 2012 and cannot assert a Fourth Amendment right as to

16 either privacy or the seizure of the home.

17     Plaintiffs still maintained a possessory right to their

18 *personal* property, of course.  As BANA itself acknowledges, its

19 

20     [8]Fed. R. Evid. 1002 (original writing is required to prove its
   content).  Nor is the exception in Fed. R. Evid. 1007, allowing
21 proof of a document's contents by the "written statement of the
   party against whom the evidence is offered," applicable: the only
22 statements that assert a defect in the writ are statements by
   LASD's officers and employees, and LASD is not a party to this
23 case.

24     [9]"A duplicate is admissible to the same extent as the original
   unless a genuine question is raised about the original's
25 authenticity or the circumstances make it unfair to admit the
   duplicate."  Fed. R. Evid. 1003.

26     [10]"[I]n California, once a foreclosure sale concludes and the
   purchaser records the deed in accordance with applicable law, the
27 original trustor or borrower no longer has an interest or right in
   the subject real property."  In re Edwards, 454 B.R. 100, 106
28 (B.A.P. 9th Cir. 2011).

1    "contractors . . . moved the personal possessions remaining on the

2    Leadwell Property to a U.S. Storage Centers facility." (BANA's

3    Mot. at 14.)   They did so pursuant to Cal. Civ. Proc. Code §

4    1174(e)-(l), which allows a landlord or judgment creditor[11] to

5    remove and store property left behind by former residents.

6    Plaintiffs do not challenge the constitutionality of § 1174, which

7    provides that the landlord or judgment creditor must return the

8    property on demand.

9        Of course, Plaintiffs presumably left their possessions behind

10   because they were forced to leave quickly by the sheriff's

11   deputies.   Nonetheless, BANA, acting on behalf of Mellon, had the

12   right to remove property left behind in the house, to which

13   Plaintiffs did *not* have a possessory right – including the right to

14   store their possessions there.[12]   Because the removal itself was

15   lawful, because Plaintiffs could have removed their possessions in

16   any of the months prior to the eviction, and because the

17   possessions were left behind on Mellon's property, BANA did not

18

19   _____

20       [11]Section 1174 refers only to a "landlord," but Cal. Civ.
     Proc. Code § 715.030 clarifies that § 1174 applies to a judgment

21   creditor taking possession pursuant to a writ of possession as
     well.

22       [12]In their opposition to the City's motion, but not in their

23   motion for summary judgment, Plaintiffs cite in passing to In re
     Perl, where the Ninth Circuit held that a purchaser violated an

24   automatic stay in a bankruptcy proceeding by locking a resident out
     and thereby exercising control over the resident's personal

25   property, which was at that time property of the bankruptcy estate.
     513 B.R. 566, 576 (B.A.P. 9th Cir. 2014).   Plaintiffs note that

26   Javier Hernandez's second bankruptcy petition was still pending at
     the time of the eviction.  (Opp'n to City's Mot. at 10.)   However,

27   Mellon had moved for and received an order for relief from the stay
     in the bankruptcy, which distinguishes this case from Perl.   See In

28   re Hernandez, No. 1:12-bk-19878-VK, Dkt. No. 24 (Bankr. C.D.Cal.
     Nov. 30, 2012) (order granting relief from stay).

13

1  conspire with the LASD or the LAPD to effect an unreasonable

2  seizure of Plaintiffs' property.[13]

3       Finally, Plaintiffs appear to allege an excessive force claim

4  under the Fourth Amendment:

5       Using 100 officers in the dark at 4:30AM with tanks,

6       bulldozers, and guns surely was excessive force when there

7       were no prior violent altercations or reason to believe there

8       would be one. It was excessive force that would intimidate

9       anyone – and there were children inside this home. It was a

10      protest – not an armed shoot-out at the Okay Corral.

11 (Pls.' Reply at 4; see also Opp'n to LAPD's Mot. at 7.)

12      Plaintiffs point to no case, however, in which the presence of

13 a large number of officers or particular equipment has been the

14 sole basis for a Fourth Amendment excessive force claim, and the

15 Court can find no such case.  Javier Hernandez admitted in his

16 deposition that the extent of Plaintiffs' interaction with the

17 sheriff's deputies on the morning of the eviction was that "they

18 came in and they asked us to leave," and Plaintiffs did leave,

19 peacefully.[14]  (Suppl. Decl. Tuan Uong, Ex. T at 37.)  No evidence

20 of violence, or even a *threat* of violence beyond the presence of

21

22

23       [13]Nothing in this order prevents Plaintiffs from suing BANA or
24 the storage company for the loss or destruction of the property
   under any appropriate state law, of course.  (TAC, ¶ 107 (on
25 entering the storage unit, Plaintiff Javier Hernandez "discovered
   most of the property was lost, stolen, damaged or destroyed").)

26       [14]Given that the house was the site of an ongoing protest and
27 had been walled off by protesters (Decl. Javier Hernandez, ¶ 51),
   it was not unreasonable of LASD to anticipate that a large number
28 of law enforcement officers and special equipment might be needed
   to effect the eviction.

1 armed officers, is presented in the record.  There is no excessive

2 force claim.

3      No rational trier of fact could conclude that there was a

4 Fourth Amendment violation on this record.

5 **B.   Antitrust Claim**

6      Plaintiffs' antitrust claim was dependent on arguments about

7 the market share of former defendant Public Storage.  As Public

8 Storage was not the storage company involved in this case and is no

9 longer a party (see Dkt. Nos. 184, 189), there would seem to be no

10 basis for the claim.  Plaintiffs do not defend the antitrust claim

11 in their opposition to BANA's motion, and the Court deems the claim

12 abandoned.

13 **C.   UCL Claim**

14      Section 17200 of the UCL, under which Plaintiffs sue, forbids

15 "any unlawful, unfair or fraudulent business act or practice."

16 Cal. Bus. & Prof. Code § 17200.  Plaintiffs allege that the

17 eviction itself was unlawful under state law, but, as discussed

18 above, it was not.

19      Plaintiffs also allege that Public Storage's business

20 practices are unfair, but, as noted above, Public Storage is no

21 longer a party here.

22      Nor have Plaintiffs presented evidence the BANA was behind a

23 scheme to harass and intimidate protesters.  Evidence that some

24 harassment took place, with nothing tying it to the bank, cannot

25 support a UCL claim.

26      Finally, Plaintiffs argue that the eviction was unlawful or

27 unfair because BANA had allegedly announced a moratorium during the

28 holidays.  However, no specific dates were attached to the

1   announcement, (Supp. Decl. Javier Hernandez, Ex. 1), and there is

2   no evidence that Plaintiffs knew of the moratorium, assuming it

3   existed and still applied on December 27, 2012.  (See Pls.' Stmt.

4   Genuine Disputes Fact at 4 (acknowledging that Javier Hernandez was

5   not aware of a moratorium).)  Thus, they could not have relied on

6   it to their detriment.

7        No rational trier of fact could find a violation of the UCL on

8   this record.

9   **IV.   CONCLUSION**

10       The Court GRANTS summary judgment to Defendants and DENIES

11  summary judgment to Plaintiffs.

12

13

14  IT IS SO ORDERED.

15

16

17  Dated: August 14, 2015

18                                   DEAN D. PREGERSON
                                     United States District Judge

19

20

21

22

23

24

25

26

27

28